# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Marriage of | No. 87424-1-I |
| MEHER ZAHIR, | DIVISION ONE |
| Respondent/Cross-Appellant, | UNPUBLISHED OPINION |
| and | |
| JAWAID ZAHIR, | |
| Appellant/Cross-Respondent. | |

BIRK, J. — Meher Zahir[1] successfully petitioned for dissolution against Jawaid Zahir, and the trial court awarded her the family home in Sammamish, Washington.  Their daughters, Sana and Sulva Zahir, testified at trial they had spent money renovating the home, and, in distributing debts, the trial court found an unasserted unjust enrichment claim against the marital community for the daughters' improvements and ordered repayment to them.  We conclude the trial court erred in sua sponte raising an unasserted unjust enrichment claim as a debt against the marital property.  We reverse and remand for a new property division consistent with this opinion.

---

[1] Because the parties and their daughters share last names, for clarity, we refer to the parties by their first names.  No disrespect is intended.

I

A

Jawaid and Meher were married in December 1974. They have three daughters: Maryam Zahir,[2] Sana, and Sulva. Because of her disabilities, Maryam has always lived with Meher, where Meher and a full-time caretaker alternate taking care of Maryam. Jawaid and Meher have not lived in the same house for a long time.

Jawaid retired from being an electrical engineer full-time in 2015, and his last payment from a part-time job he worked as a consultant was in April 2023. Throughout the marriage, Meher did not work outside of the home and Jawaid paid for Meher's expenses.

The two reportedly bought a home in Sammamish, Washington in 1998, that has no mortgage. Meher has lived in the home full-time since 2015. Before COVID-19 travel restrictions were imposed, Jawaid would visit the home once a month for a weekend or three to four days while he was living in Canada. After the pandemic, Jawaid visited the home in 2023 at least once, during Eid.

In February 2023, Jawaid sent Meher a text message indicating an intent that they divorce, which Meher described to Sana as meaning that Jawaid had divorced her under Sharia law. Meher petitioned for dissolution in superior court in March 2023. In her petition for dissolution, Meher asked to reside in the family

_____

[2] The record uses both "Maryam" and "Miriam." Because both parties use "Maryam" in their briefing in the trial court and on appeal, we defer to the them on the correct spelling of her name.

home, and Jawaid disputed the request because their "primary asset is [the] family home in Sammamish."

B

The parties filed contemporaneous trial briefs on July 1, 2024. Meher asked for a "separate property claim against the home" based on Sulva and Sana having made a separate property gift to Meher in the form of contributions toward improvements to the home. She asserted her daughters "contributed over $150,000 towards" "major improvements to the home and gifted to Meher only, with the idea this would be an investment in her future and for their adult disabled sister whom the sisters help support." Jawaid's trial brief shows that he anticipated argument concerning the daughters' contributions toward the home, but incorrectly anticipated Meher's argument: Believing Meher planned to argue the daughters' contributions should be deemed loans, he argued that there was no evidence the contributions were loans and that, as unexplained transfers, they should be deemed gifts. The record does not show that before trial Jawaid argued anything other than the loans were gifts to the community.

At trial, Meher reasserted her separate property claim against the home and valued the claim at $400,000. She testified that Sulva and Sana did not make any contributions to the home and that they spent between $150,000 and $160,000 to increase the home's value because "they know this is all . . . their house." "[T]his is Islam law, so my religion. When the parents die, the house goes to the children. With that belief, they—they said, you know, that, Mama, we'll make the house comfortable for you."

3

Sulva and Sana also testified about the renovations. Sulva testified that neither Sana nor she would pay Meher directly, and instead, she would pay for the renovations herself or transfer money to Sana to pay the contractor. Sulva testified she contributed approximately $60,000 to $70,000 to the renovations that occurred from February 2023 until 2024. Sulva offered two rationales for contributing to the renovations: the renovations were for "the care of my mother and sister, who are living in the home, and also with the intention that this home is going to stay within the family." When asked whether the contributions were a loan or a gift, she offered,

> it's hard to say because we were expecting—if this home is going to sell, to be honest, I would not have put in, or my sister, $150,000 into this property. So, you know, it came from a genuine—I guess you could say kind of it is a gift, but it's also with an expectation it's going to come back to us because it's in our—going into our own home.

She testified the renovations were not for Jawaid, "it wasn't to his benefit to sell the home that—we just wanted to keep it in the family." When she brought the renovations to his attention, she testified he did not forbid the renovations or question why they were making them. "He always knew, and he's always said, he always promised, you know, with a good heart, that this would be in the family home for Mama and [Maryam] at that time."

Sana identified two different projects that contributed towards the renovations: a remodel for the primary bathroom and the "main big" remodel. She paid between $100,000 and $130,000 for the main big remodel in total, paying an approximate down payment of $70,000. She testified that after February 2023, she paid between $90,000 to $100,000. In differentiating the cost of the two

4

remodels, Sana testified that she paid approximately $38,000 for the bathroom remodel and $150,000 for the main big remodel. She estimated the total value of both remodels at $180,000. When asked by the court if she paid approximately $100,000 after February 2023, she reiterated she paid $90,000 to $100,000.

Sana testified the contributions were loans because "we were always under the impression, without a shadow of a doubt, that this home would be inherited by me, and Sulva, and [Maryam]." In answering Jawaid's question about whom the daughters intended the money to benefit, Sana answered, "My mother and us, eventually." She indicated she had concerns about the money she had contributed after learning of the divorce, but added, "even at the time of divorce, even at that time [Jawaid's] intentions were, as per his own words, that he did not have intentions of selling the house. So why would I think he would sell the house? He had promised us our entire lives and up to the divorce." She also reiterated the payments were a loan, stating that the lack of written documents identifying the loan terms was because "[i]n a family situation, you don't—I wouldn't even imagine, you know, writing that, oh, this is a loan and when you die one day this is going to be ours and that's why I'm doing this."

Jawaid disagreed the daughters made a loan to the mother and stated there was no discussion of the loan. He testified the daughters paid "their mother because she was the one living in it." He acknowledged that, if the court decided to split "this one" half and half, Meher and he could "share the $150,000 also, half house. . . . So that the children are happy that, you know, they invested some money after they got their money back, half from me, half from their mom."

5

Before closing arguments, the parties stipulated the value of the home was $1.85 million and the value of the renovations was $375,000.

C

In closing argument, Meher repeated her claim that the daughters gave her a separate property gift of $375,000, which Meher then invested as separate property into renovating the home. She argued that the primary bath and bedroom remodel proved the daughters' intention was "for only their mother to receive that benefit." She added, "[e]ven if the Court does not consider [Meher] to overcome the presumption of community property, this Court can still consider the intent and nature of the gift in fashioning what it considers a just and equitable split of property."

In asking about an "alternative approach," the court indicated that it seemed "there is some expectation of repayment, either by virtue of inheriting the property upon death of the parents, or if, now, under this new scenario of, sort of the potential of the home being sold, that they want their money back that they invested towards that." Meher reiterated the contributions were a gift, and the court responded that the categorization of the contributions as a gift,

> doesn't matter, because it seems to me that there was some obligation of repayment, either in the form of inheritance, or if the home was sold, yes, the daughters didn't want Mr. Zahir to benefit from their investment in the property, and they would expect their money in return and that that is an obligation against the marital estate.

The court further asked, "[W]hy couldn't the daughters, if they—push came to shove, why couldn't they seek to recoup their investment, based on a claim of

6

quasi contract and unjust enrichment, and why wouldn't that be an obligation running against the marital community?" Meher agreed with the court's theory of recovery, noting it was "a possible alternate argument that could be made in this case," and referenced Jawaid's testimony "that he also didn't object to them being refunded the original amount that they put towards the house."

Jawaid argued that he testified "he would be willing, if [Meher] agreed, to reimburse the daughters as a stipulation." The court inferred from this testimony there was some obligation to repay the daughters, and Jawaid argued he might have stipulated to repayment because "of family relationships and the harm that would come from—it has already happened in this divorce." He also argued Meher did not establish the daughters' contributions were a separate gift.

The court inquired again why it could not find an unjust enrichment claim against the marital community or "at least a colorable right of reimbursement that translates to a debt or an obligation against the community here?" The court recognized a potential claim might not be enforceable, but reiterated the court has discretion to characterize debt "in a certain way and assign it to one party or another" under Gormley v. Robertson, 120 Wn. App. 31, 83 P.3d 1042 (2004).

Jawaid argued that Meher's position appeared to change from her trial position, and that the daughters did not appear to acquire an interest in the property because of their contributions. He added, "this unjust enrichment is a new legal theory to me in this case." In concluding, Jawaid noted that the daughters "continued to invest or give money or loan money, however that's characterized, into the home when they were on notice that there was a risk involved."

7

D

Before issuing its final order, the court held a hearing to discuss its proposed orders. When the court asked why the parties stipulated to the increased appraisal value, Jawaid argued the stipulation was for the separate property claim and that the finding of an unjust enrichment claim was "a whole other legal reasoning that we didn't have the opportunity to argue or even consider." Meher argued Jawaid had notice of the unjust enrichment claim because it was argued at trial and the court questioned him about it during closing arguments. In addition, she asked that postjudgment interest begin accruing after she has an opportunity to sell the house.

The court noted that even if the underlying theory is different, "it seems to me that the result is the same. It's [$]375,000 in the event the home was going to be sold and whether—and it's just a debt. It's not a separate property interest." The court also said the interest would accrue from the entry of judgment.

Despite finding the daughters' "financial contributions toward the renovations" did not support the mother's separate property claim, the court concluded in its findings of fact the "the transfer of money to third party contractors, at least pre-separation, was a gift to the community, even if it would benefit the mother primarily." The court also found that

> it was clear that the transfer of money for the renovations was specifically aimed at improving the living space for the mother and Maryam AND to increase the value of the home for the daughters' ultimate benefit upon inheritance. In this sense, any "gift" was conditioned on that plan.

The court ultimately concluded,

> Even if the transfer of money was initially a gift, and even if the purported "loan" of this money to the marital community may not give rise to an enforceable contract, the Court finds that at minimum the $240,000 investment is a debt the marital community owes the daughters, which is subject to recovery.

In the dissolution decree, the court ordered a judgment from Meher to Jawaid for $311,749 "due within 120 days" and ordered 12 percent interest. The court also ordered transfer of the family home from Jawaid to Meher. In distributing debts, the court ordered Meher to pay Sana and Sulva either $240,000 or "in the event the home is sold, the community obligation to Sana and Sulva will rise from $240,000 to $375,000." The court incorporated into the dissolution order exhibit 1, which identified a lien on the family home at $240,000. Exhibit 1 shows that the judgment amount was arrived at by calculating a transfer payment to give Jawaid approximately 37percent of the community assets and Meher approximately 63 percent of the community assets—not including $375,000 in value of home equity—and then subtracting the lump sum maintenance to arrive at a final equalization judgment.

E

Moving for reconsideration, Jawaid argued the court lacked jurisdiction over the daughters to order payment to them, the court improperly calculated the amount owed to the daughters, and the court improperly awarded Meher the increased value of the property because of the renovations as separate property. Meher argued substantial evidence at trial showed the total cost of the renovations was $240,000, and the circumstances of the case make it "unfair for the community

to retain the financial benefit of the improvements, divided between the parties, without payment to their daughters." The court denied Jawaid's motion.

Jawaid appeals.

II

Jawaid argues the trial court erred in ordering payment on the unjust enrichment claim because he did not have notice of the claim and because the daughters were not parties to the action. We agree.

After considering the relevant statutory factors, the dissolution court has "a statutory duty to determine and divide the parties' liabilities," and may do so "as shall appear just and equitable." In re Marriage of McKean, 110 Wn. App. 191, 194-95, 196 , 38 P.3d 1053 (2002); see RCW 26.09.080. "All property, both separate and community, is before the court for a just and equitable distribution." In re Marriage of Porter, 3 Wn.3d 579, 589, 555 P.3d 379 (2024). The court's discretion to distribute property, including debts, is broad. Gormley, 120 Wn. App. at 40; In re Marriage of Thomas, 63 Wn. App. 658, 660, 821 P.2d 1227 (1991).

"A property division made during the dissolution of a marriage will be reversed on appeal only if there is a manifest abuse of discretion." In re Marriage of Muhammad, 153 Wn.2d 795, 803, 108 P.3d 779 (2005). " 'A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons.' " Id. (quoting In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997)). "A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual

10

findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard." Littlefield, 133 Wn.2d at 47. Appellate review is limited to whether the trial court's distribution of property was fair and equitable. In re Marriage of Crosetto, 82 Wn. App. 545, 556, 918 P.2d 954 (1996). A trial court does not have authority to "adjudicate the rights of parties not before the court, even if they have an interest in the property at issue." McKean, 110 Wn. App. at 195.

Here, the trial court ordered payment to the daughters who were not parties to the action before distributing the marital property. The trial court's findings of fact stated it did not decide the merits of the daughters' potential unjust enrichment claim, but, in the dissolution decree, it ordered Meher to pay the daughters either $240,000, or $375,000 if the parties sell the family home. The order determines the daughters are to receive $375,000 in proceeds from the sale of the house, with the balance of the proceeds divided with approximately 37 percent to Jawaid and approximately 63 percent to Meher, despite saying the debt is assigned to Meher. The trial court abused its discretion by acting without authority to order payment to the daughters from the marital estate before distributing the marital property to the parties.

Meher argues the court properly exercised its statutory duties and did not adjudicate the rights of the daughters or the parties in distributing the debt from the marital estate to the daughters.[3] We disagree.

The trial court determined it may distribute debt even when the debt may be unenforceable and cited Gormley, and, relying on In re Marriage of Sievers, 78 Wn. App. 287, 313 897 P.2d 388 (1995), it decided that it may create, in equity, "a lien where there is no valid lien at law and one is needed to prevent an injustice." "An equitable lien is a remedy intended to protect one party's right to reimbursement." In re Marriage of Miracle, 101 Wn.2d 137, 139, 675 P.2d 1229 (1984). "A right to reimbursement may not arise if the contributing spouse received a reciprocal benefit flowing from the use of the property." Id. "In that case, equity will find that the contributing spouse has already been reimbursed." Id.

The cases relied on by the trial court do not support the proposition that a trial court may raise sua sponte a previously unasserted debt and order payment or an equitable lien to a third party creditor in dividing the property. In Gormley, this court upheld a distribution of debt when, after separation, one partner of a committed intimate relationship continued to make payments on a loan the two had taken out to pay debts, including a debt acquired by one party before the relationship began. 120 Wn. App. at 34. Additionally, the statute of limitations for

---

[3] The parties also dispute whether the trial court properly concluded the daughters have a potential unjust enrichment claim and what its purported value is. Because we conclude the trial court improperly ordered payment to the daughters who were not parties to this action and where a debt was never asserted before closing argument, we do not discuss whether the trial court's findings support a claim for unjust enrichment or its value.

12

collecting on the loan had passed. Id. at 40. The court concluded the dissolution court did not err in equitably distributing the debt by giving the partner who had made payments a credit, despite the debt lapsing, because the parties incurred the debt together and one party benefited from the proceeds. Id. at 40-41.

In Sievers, the parties reached a settlement agreement before dissolution that did not include a lien against the wife's property to secure the husband's $2 million tax liability. 78 Wn. App. at 301-02, 312. The wife asked for an equitable lien at the dissolution trial. Id. at 301-02. This court concluded dissolution courts had authority to enforce a tax liability clause as an equitable lien against real estate awarded to the husband. Id. at 314. This court then remanded to the dissolution court to "exercise its discretion, to award a lien or not to award a lien, depending upon the relevant circumstances at the time of the remand hearing." Id.

These cases support the proposition that when a party to the dissolution properly asserts a debt, a trial court within its discretion may award an equitable lien to the other party—not to a third party—and only after considering all the parties' assets in a just and equitable fashion.

By sequestering $375,000 worth of value from the marital community to be paid to a third party before distributing property, the trial court failed to make a just and equitable distribution of all the parties' assets. Therefore, we remand for the trial court to enter a new property division order properly considering all of the marital property.

III

Meher cross appeals, arguing the trial court erred in ordering that "payment and interest on the judgment shall begin from the entry of this Order on Reconsideration" because Jawaid's right to enforcement did not arise until 120 days after the order clarifying judgment was entered. Because we reverse and remand for a new property division, which would necessarily entail a new judgment, we decline to reach Meher's argument as it has become moot.

IV

Both parties request attorney fees. Jawaid failed to file an affidavit of financial need, so we do not consider Jawaid's request for attorney fees. RAP 18.1(c); In re Marriage of C.M.C., 87 Wn. App. 84, 89, 940 P.2d 669 (1997). RCW 26.09.140 permits an appellate court to "in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs." The court may consider "the issues' arguable merit on appeal and the parties' financial resources, balancing the financial need of the requesting party against the other party's ability to pay." In re Marriage of Kim, 179 Wn. App. 232, 256, 317 P.3d 555 (2014).

Both parties' arguments have merit, yet Meher has demonstrated she is currently unable to pay her own attorney fees because her expenses exceed her monthly income. However, because Meher represents she still intends to sell the home, her current inability to pay appears to result from being awarded the home

she asked for at the dissolution proceeding and will be remedied by selling it.  We conclude each party will bear their own attorney fees on appeal.[4]

Reversed and remanded for a new property distribution consistent with this opinion.

_____
Birk, J.

WE CONCUR:

_____          _____
                                          Mann, J.

_____

[4] At the entry of judgment, when the new property division is entered, the parties are free to ask for attorney fees incurred on remand, which the trial court may award within its discretion.  See RCW 26.09.140.